IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICIA ERWOOD, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 14-1284 |
| | ) |
| LIFE INSURANCE COMPANY OF | ) Chief Magistrate Judge Maureen P. Kelly |
| NORTH AMERICA; WELLSTAR | ) |
| HEALTH SYSTEM, INC.; GROUP LIFE | ) |
| INSURANCE PROGRAM, | ) |
| Defendants. | ) |

## **OPINION**

### I. **INTRODUCTION**

This matter is before the Court following the conclusion of a bench trial held February 6,

2017, and February 7, 2017. In this case, Plaintiff Patricia Erwood ("Plaintiff") seeks to recover

the losses and related damages that she sustained when Defendants WellStar Health System, Inc.

and Group Life Insurance Program ("the Plan") (collectively, "WellStar") breached a fiduciary

duty to Plaintiff by misrepresenting and failing to adequately inform her of the need or the means

to convert two group life insurance policies purchased by her now-deceased husband, Dr. Scott

Erwood, ("Dr. Erwood") as part of an employee benefit plan established pursuant to the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, into a personal

policy.

### II. **PROCEDURAL BACKGROUND**

Plaintiff filed the operative Complaint, ECF No. 34, on November 19, 2014, therein

raising two Counts against WellStar and Life Insurance Company of North America ("LINA").

In Count I, brought against LINA and the Plan, Plaintiff sought relief pursuant to 29 U.S.C.

§ 1132(a)(1)(B). Id. ¶¶ 33-42. In Count II, Plaintiff sought relief against WellStar and LINA pursuant to 29 U.S.C. § 1132(a)(3). Id. ¶¶ 43-57. LINA filed its Answer on May 15, 2015. ECF No. 57. WellStar filed its operative Answer on August 26, 2015. ECF No. 72.

On February 26, 2016, LINA filed a Motion for Summary Judgment. ECF No. 87. Also on February 26, 2016, WellStar filed a Motion for Summary Judgment. ECF No. 92. On April 6, 2016, Plaintiff filed a Cross Motion for Partial Summary Judgment. ECF No. 98. In an Opinion and Order issued on September 16, 2016, this Court: (1) granted LINA's Motion for Summary Judgment as to Count I and denied it as to Count II; (2) granted WellStar's Motion for Summary Judgment as to Count I and denied it as to Count II; and (3) denied Plaintiff's Cross Motion for Partial Summary Judgment. ECF No. 119.

On February 3, 2017, Plaintiff filed a Motion to Dismiss LINA from the case because she had reached a settlement with LINA. ECF No. 137. On February 6, 2017, the Court granted the Motion to Dismiss and terminated LINA from the case.[1] ECF No. 138. Accordingly, the trial proceeded against WellStar only as to the alleged violation of 29 U.S.C. § 1132(a)(3).

The non-jury trial was conducted on February 6, 2017, and February 7, 2017. Final Proposed Findings of Fact and Conclusions of Law were filed on February 21, 2017. ECF Nos. 145-146.

This Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52, mindful that Plaintiff bears the burden of proof by a preponderance of the evidence and that the Court is the sole judge of the evidence, including credibility of the trial witnesses.

---

[1] In the Order, the Court noted that the dismissal with prejudice of LINA did not foreclose the remaining defendants from arguing after trial that they are entitled to a set-off nor did it foreclose Plaintiff from arguing that the remaining defendants are not entitled to a set-off, or how such set-off, if any, should be determined. ECF No. 138.

## III. FINDINGS OF FACT

1. Plaintiff's husband, Dr. Scott Erwood, was an employee of WellStar, where he worked as a neurosurgeon. TT1[2] at 25, 31.

2. As a WellStar employee, Dr. Erwood was a participant in WellStar's employee benefit plans, including basic and supplemental life insurance.

3. LINA[3] insures the life benefits for WellStar and issued life insurance benefits to cover WellStar employees.

4. The Plan included one basic life insurance policy (FLX-980135) and one optional or voluntary life insurance policy (FLX-980136).

5. WellStar was the plan administrator for the Plan. TT2 at 31.

6. During his employment with WellStar, Dr. Erwood was insured for $500,000 in life insurance benefits under each of the life insurance policies issued by LINA, the basic and voluntary policies. As such, Dr. Erwood had a total of $1,000,000 in life insurance under the Plan. Trial Exhibit 2.

7. In November of 2011, Dr. Erwood suffered a seizure that was subsequently diagnosed as a symptom of a malignant brain tumor. ECF No. 147 at 58.

8. Dr. Erwood stopped working full-time at WellStar on November 16, 2011. Trial Exhibit 6.

9. Dr. Erwood took an initial period of leave under the Family and Medical Leave Act ("FMLA") from November 16, 2011, through December 12, 2011. Trial Exhibit 1.

10. Dr. Erwood continued to work part-time and/or receive pay from WellStar until January 30, 2012. TT1 at 67; Trial Exhibit 32.

---

[2] The trial transcript for February 6, 2017, which is docketed at ECF No. 147, is denoted as "TT1." The trial transcript for February 7, 2017, docketed at ECF No. 148, is denoted as "TT2."

[3] The Court notes that, at trial, the parties referred to LINA and CIGNA interchangeably.

3

11. According to WellStar's records, Dr. Erwood resumed FMLA leave on January 31, 2012. The FMLA leave ended on September 4, 2012. Trial Exhibit 1.

12. WellStar provided for its employees 36 weeks of FMLA leave for a serious medical condition. Trial Exhibit 1.

13. While on FMLA leave, Dr. Erwood became eligible for benefits under WellStar's Long-Term Disability ("LTD") Plan, which is also insured and administered by LINA. ECF No. 91 ¶ 22; Trial Exhibit 25.

14. Dr. Erwood filed a claim for LTD benefits through WellStar's LTD Plan. His claim was approved. ECF No. 91 ¶ 22.

15. WellStar was aware that Dr. Erwood was on LTD. Trial Exhibit 6.

16. Around the time Dr. Erwood resumed FMLA leave in early 2012, Joey Hunt, the director of human resources for the WellStar medical group, called the Erwoods and spoke with Plaintiff. Plaintiff expressed to Hunt that she had questions about their benefits going forward. In response, Hunt set up a meeting for the Erwoods with benefits representatives who could answer their questions. TT2 at 67-74.

17. The meeting, which took place sometime in early 2012 at the WellStar administrative building, was attended by Plaintiff and Dr. Erwood, Joey Hunt, Vinciane Drake and Kim Love. TT2 at 67.

18. At all times relevant to this action, Vinciane Drake was the only benefits representative for WellStar in the areas of life insurance and long-term disability. TT1 at 114; TT2 at 134.

19. Hunt invited Drake to the meeting with the Erwoods because "she handled life insurance at the time." TT2 at 70.

4

20.     At the 45-minute meeting, Dr. Erwood engaged in conversation, but asked the same question two or three times. Dr. Erwood and Plaintiff were both emotional in the meeting; Plaintiff was crying by the end of it. TT2 at 76-77.

21.     Vinciane Drake testified that WellStar did not have this kind of meeting with every employee who went on leave, but did so "[o]nly if they came to my office and said I don't understand this. Give me more information." TT1 at 125.

22.     At the meeting, Plaintiff and her husband repeatedly asked Ms. Drake if "everything, our coverage, is all our coverage going to remain the same. And she confirmed that it would be." TT1 at 98. Plaintiff left the meeting confident that "everything was okay, that benefitswise we were still the same." TT1 at 35. Benefits following termination (*i.e.*, post-FMLA) were discussed at the meeting. Life insurance, but not conversion, was also discussed at the meeting.

23.     On February 21, 2012, Kim Love, Senior Human Resources Consultant for WellStar, mailed to Dr. Erwood an FMLA leave packet stating that his FMLA leave would end on September 4, 2012 and failure to return to work would be considered a voluntary separation of employment. Trial Exhibit 1.

24.     The FMLA leave packet informed Dr. Erwood that while on unpaid FMLA absence, he was responsible for paying premiums in the amount of $272.90 to WellStar to maintain medical, dental, vision and life coverage and listed the schedule for when premium payments were due. Trial Exhibit 1.

25.     The FMLA packet did not provide information regarding where to send premium payments beyond the FMLA leave period. Trial Exhibit 1.

26.     The FMLA leave packet stated that with regard to Medical, Dental, Vision, Specified Health Event and Cancer Insurance, employees on FMLA leave continue to pay the normal pay period deduction amounts to maintain these coverages, and after the initial 36 weeks, employees will begin paying the full premium rate. Trial Exhibit 1.

27.     Regarding life insurance for an employee on leave and thereafter, the FMLA packet stated: "Life insurance benefits may be continued up to 36 weeks. A continuation/conversion policy may be available for employees requesting to continue life insurance coverage beyond 36 weeks. Please contact the Benefits office for specific details." Trial Exhibit 1.

28.     The FMLA packet did not include (1) the materials necessary to convert or continue life insurance coverage beyond 36 weeks; (2) information about where to access such materials; (3) information about where to send such materials in order to complete the conversion process, nor (4) the date that said materials were due in order to ensure continuation of coverage. Trial Exhibit 1.

29.     WellStar did not send to Dr. Erwood any information regarding conversion and continuation of life insurance after the FMLA packet. TT1 at 44-45.

30.     Dr. Erwood's life insurance policies provided a Terminal Illness Benefit ("TIB") which allows the insured to claim a portion of life insurance benefits while alive if the insured suffers from a terminal illness and is expected to die within 12 months. Trial Exhibits 27, 28.

31.     On August 15, 2012, Dr. Erwood executed a TIB claim form for $250,000. He could have claimed $250,000 on each of the policies, for a total of $500,000. The Erwoods filled out a portion of the required form. Trial Exhibit 6.

32.   Vinciane Drake filled out the employer portion of the TIB claim form, signed and dated it on August 21, 2012.  Trial Exhibit 6.

33.   Drake noted on that form that premiums for Dr. Erwood's life insurance were paid through August 31, 2012.  Trial Exhibit 6.

34.   Under the terms of the life insurance policies, an insured could apply for conversion of the policies upon expiration of coverage.  The relevant policy language provides:

> To apply for conversion coverage, the Insured must, within 31 days after coverage under the Policy ends:
> 1. submit an application to the Insurance Company; and
> 2. pay the required premium.
>
> . . .
>
> Conversion insurance will become effective on the 31st day after the day coverage under the Policy ends provided the application is received by us and the required premium has been paid.
>
> . . .
>
> *Extension of Conversion Period*
> If an Insured is eligible for conversion insurance and is not notified of this right at least 15 days prior to the end of the 31-day conversion period, the conversion period will be extended.  The Insured will have 15 days from the date notice is given to apply for conversion insurance.  In no event will the conversion period be extended beyond 90 days.  Notice, for the purpose of this section, means written notice presented to the Insured by the Employer or mailed to the Insured's last known address as reported by the Employer.

Trial Exhibit 27 at ERW000089-ERW000090; Trial Exhibit 28 at ERW000010.

35.   On September 4, 2012, Dr. Erwood's 36 weeks of FMLA leave expired.  Trial Exhibit 1.

36.   On or around September 5, 2012, LINA issued a letter to Dr. Erwood advising him that his TIB claim under the Accelerated Benefits provision of the life insurance policies had been approved in the amount of $250,000, as he requested.  Trial Exhibit 7.

7

37. The letter expressly stated that "[t]his payment reduces the amount of your life insurance to \$750,000.00." Trial Exhibit 7.

38. Vinciane Drake at WellStar received a copy of the September 5, 2012, letter from LINA. Trial Exhibit 8.

39. During the period of time that Dr. Erwood was on leave and dying, Plaintiff contacted Vinciane Drake on multiple occasions with benefits and insurance questions. TT1 at 33, 34, 37, 40.

40. On June 26, 2013, Dr. Erwood died of a malignant brain tumor. TT1 at 46.

41. At the time of Dr. Erwood's death, the Erwoods had six children who were financially dependent on them. One of their children died three months before Dr. Erwood died. TT1 at 26.

42. Plaintiff completed her portion of the death benefit claim form on September 3, 2013. TT1 at 46.

43. Vinciane Drake, on behalf of WellStar, completed the employer portion of the death benefit claim form on September 19, 2013. Trial Exhibit 10.

44. When Vinciane Drake submitted the employer portion of the death benefit claim form to LINA, she indicated that Dr. Erwood was on FMLA leave immediately prior to his death. Trial Exhibit 10.

45. When Vinciane Drake completed the death benefit claim form, she stated that Dr. Erwood's life insurance coverage was "still in effect through the Date of Death." Trial Exhibit 10.

46. Following submission of the life insurance claim, the claims representative of LINA, identified as Adam F., e-mailed Vinciane Drake on October 2, 2013, requesting additional

8

information to process the claim. Drake responded that Dr. Erwood's "[p]remiums were paid" and that she had not completed all of the information on the claim form because she had done so when Dr. Erwood applied for accelerated benefits. Trial Exhibit 11.

47. On October 3, 2013, the claims representative of LINA, identified as Adam Frederick, noted on a Claim Telephone Documentation entry:

> I spoke with Vinciane and confirmed Scott's last day worked as 11/16/2011. I asked if he had used any Extended Illness after that date and she said that he was out on FMLA. I explained to her that FMLA only continues the coverage for 36 weeks and that his coverage would have terminated after that time and he would have needed to convert his coverage. She asked if we had sent him the paperwork to convert and I explained that we do not mail out the paperwork and that it is the employer's responsibility. She was not aware of this and stated that she wanted to look into this and would get back with me.

Trial Exhibit 13. Drake admitted that the note was an accurate summation of the call. TT1 at 146-147.

48. By letter dated October 11, 2013, from the claims representative of LINA, identified as Adam F., LINA denied Plaintiff's claim for life insurance benefits on the basis that, at the time of his passing, Dr. Erwood's life insurance was no longer in force because he was no longer an active employee at WellStar nor had he elected to continue his policy on an individual basis. Trial Exhibit 14.

49. When Plaintiff informed Vinciane Drake of the denial of the life insurance benefits by LINA, Drake expressed surprise to Plaintiff, stating that the Erwoods were in good standing and Drake thought they were covered. TT1 at 49, 109.

50. Plaintiff appealed, but LINA upheld the benefit denial. Trial Exhibits 18, 24.

51. Pursuant to the Application for Group Insurance, executed by WellStar, WellStar agreed: (1) to support enrollment activities; (2) to allow eligible persons an opportunity to enroll

9

in the life insurance coverage; (3) that it was the agent of its eligible persons for transactions relating the requested insurance and (4) to assume full responsibility for any of its wrongful acts or omissions. TT2 at 8; Trial Exhibit 46.

52. Pursuant to the Application for Group Insurance, executed by WellStar, WellStar further agreed to promptly furnish any records or other information necessary to insure the proper administration of the insurance plans to LINA, and that LINA would provide no services in connection with ERISA compliance. TT2 at 9-10; Trial Exhibit 46.

53. Pursuant to an Appointment of Claim Fiduciary form executed by WellStar and LINA, LINA, as "Claim Fiduciary," did not have fiduciary responsibility with respect to the administration of the plan, and its sole responsibility was for payment of benefits. TT2 at 11; Trial Exhibit 25.

54. According to the Summary Plan Descriptions ("SPDs"), WellStar is the Plan Administrator of the Plan, responsible for the administration of the Plan, including the notification of conversion with employment termination, as well as other duties set forth in the Manual. Trial Exhibits 29, 30.

55. Notwithstanding the statements in the Application for Group Insurance, the Appointment of Claim Fiduciary form, the SPD and the Manual, according to WellStar, LINA had no authority to tell WellStar how to carry out its fiduciary duties. TT2 at 31.

56. LINA provided an Administrative Services Manual ("the Manual") to WellStar for instruction as to how to administer their benefits insured by LINA. Trial Exhibit 15.

57. LINA met with WellStar employees regarding the procedures in the Manual. TT1 at 11; TT2 at 31-32.

58. Through the Manual, LINA conveyed to WellStar that WellStar "play[s] an important role in making sure that employees use and understand their group insurance benefits.'" Trial Exhibit 15 at 1.

59. The Manual contained an entire section related to an employee's conversion of life insurance policies, explaining that WellStar's role is to "[g]ive employees a **Conversion Brochure, with the employer section completed**, no more than 15 days beyond the date the employment terminates." Trial Exhibit 15 at 51-53 (emphasis in original); TT1 at 120.

60. This language tracks the language in the SPDs, which explains that if the employer does not provide notice 15 days beyond the date employment terminates, the conversion period will be extended, and that notice means "written notice presented to the insured by the employer or mailed to the insured's last known address as reported by the employer." Trial Exhibit 29 at ERWOOD-WS0620; Trial Exhibit 30 at ERWOOD-WS0645.

61. LINA appended this Conversion Brochure to the Manual. Trial Exhibit 16.

62. A physical copy of the Manual, with the Conversion Brochure included, was located in the WellStar HR office. TT1 at 150; TT2 at 17.

63. The Conversion Brochure also contained the following instruction, in bold typeface, related to WellStar providing the applicable conversion notice to employees: "**Make a copy of this form for your file. This is for your own protection to ensure proper notice has been given**." Trial Exhibit 16 at ERWOOD-WS0556 (emphasis in original).

64. WellStar was aware that the Manual contained this instruction. TT1 at 152.

65. WellStar did not follow the instructions contained in the Manual with respect to Dr. Erwood. TT2 at 34.

66.     WellStar did not maintain any records regarding when an employee's conversion period began and ended. TT1 at 157.

67.     As of March 19, 2014, and as confirmed by WellStar's in-house counsel, WellStar did not have a process for notifying employees of their conversion rights, other than providing a copy of the FMLA leave packet. TT2 at 97-98, 99; Trial Exhibit 22.

68.     WellStar did not follow the instructions contained in the Manual because it believes that following the instruction is not administratively feasible. TT2 at 53.

69.     WellStar admitted that completing the employer portion of the conversion notice form (WS556) would take approximately fifteen minutes. TT1 at 173; TT2 at 53.

70.     At the time Dr. Erwood became eligible for conversion of the two life insurance policies, it was WellStar's practice to provide conversion forms only upon an employee's request. TT1 at 174.

71.     The WellStar "My Benefits" employee portal did not contain conversion forms. TT1 at 118.

72.     Once an employee is terminated, such as through the expiration of FMLA leave, his/her access to the "My Benefits" portal is cut off. TT2 at 59.

73.     WellStar did not provide Dr. Erwood with the Conversion Brochure within 15 days of his employment terminating as it was required to do pursuant to the Manual. TT1 at 138, 152-153.

74.     Neither Vinciane Drake nor anyone else at WellStar ever contacted the Erwoods about converting the life insurance policies following the approval of Dr. Erwood's TIB claim for Accelerated Benefits. TT1 at 42-43, 138.

75. Ms. Erwood never received conversion or portability forms from WellStar. TT1 at 44-45.

76. In Vinciane Drake's thirty-four years working at WellStar, she had handled less than five claims for Accelerated Benefits. TT1 at 193.

77. Based on her experience with WellStar's prior life insurance carrier and without consulting the Manual, Vinciane Drake believed that Dr. Erwood converted the remaining $750,000.00 in benefits when he filed his claim for Accelerated Benefits. TT1 at 147, 193.

78. A handwritten and undated note in the claim file documenting a voicemail that WellStar employee Kersten Gerkus left for Adam Frederick, also states that WellStar was not aware that it should have told Dr. Erwood about conversion, and that "what was given in the admin manual [was][sic] confusing." Trial Exhibit 33 at ERWOOD-WS0251.

79. WellStar was not aware and/or did not understand that it was WellStar's responsibility to provide their employees with the paperwork required to convert life insurance benefits. Trial Exhibits 13, 33.

80. Plaintiff and Vinciane Drake enjoyed a good relationship during the relevant timeline, communicating periodically. Vinciane Drake testified that she was "trying to help [Plaintiff] out." TT1 at 200.

81. Plaintiff relief on WellStar and Drake because "[t]hey were the experts." TT1 at 50.

82. Plaintiff testified that Vinciane Drake was her "go-to person. She was the one that I would call with my questions and who would confirm that everything was the same." TT1 at 83.

13

83. After Dr. Erwood passed away, Plaintiff sent Vinciane Drake a handwritten note, expressing Plaintiff's gratitude for "all [of Vinciane Drake's] kindness over the last year and a half." Trial Exhibit 31.

84. Despite repeated communications with Plaintiff, at no time did Vinciane Drake, as the life insurance point person, or anyone else at WellStar provide to Plaintiff or Dr. Erwood the information and materials necessary to apply for conversion of his life insurance policies.

## IV. CONCLUSIONS OF LAW

1. Plaintiff's claim against WellStar is brought pursuant to 29 U.S.C. § 1132(a)(3), a provision of ERISA which, in pertinent part, permits a beneficiary to obtain equitable relief for violations of ERISA or the terms of an ERISA plan.

2. Even where a plaintiff is not entitled to relief under the terms of the plan as written, ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), allows a participant or beneficiary to obtain other categories of equitable relief, including: reformation of the terms of the plan to remedy false or misleading information the defendant provided; equitable estoppel, "to place the person entitled to its benefit in the same position in which he would have been had the representations been true;" and a surcharge remedy "extended to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary." CIGNA Corp. v. Amara, 563 U.S. 421, 440-42 (2011).

3. ERISA § 404, 29 U.S.C. § 1104(a)(1), requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries … ."

14

4.     An employer has the duty to maintain records with respect to each of its employees sufficient to determine the benefits due or which may become due to such employees. 29 U.S.C. § 1059.

5.     Once an ERISA beneficiary has requested information from an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, even if that information comprises elements about which the beneficiary has not specifically inquired. Bixler v. Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1993) (citing Eddy v. Colonial Life Ins. Co., 919 F.2d 747 (D.C. Cir.1990)).

6.     An ERISA "fiduciary may not, in the performance of [its] duties, 'materially mislead those to whom the duties of loyalty and prudence are owed.'" Adams v. Freedom Forge Corp., 204 F.3d 475, 492 (3d Cir.2000).

7.     This responsibility encompasses "not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." Unisys Corp. Retiree Med. Benefits Erisa Litig. v. Unisys Corp., 579 F.3d 220, 227 (3d Cir. 2009 (quoting Bixler, 12 F.3d at 1300). See also Harte v. Bethlehem Steel Corp., 214 F.3d 446, 452 (3d Cir. 2000) (quoting Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc., 93 F.3d 1171, 1182 (3d Cir. 1996)).

8.     To establish the relevant type of breach of fiduciary duty, "a plaintiff must demonstrate that: (1) the defendant was 'acting in a fiduciary capacity;' (2) the defendant made 'affirmative misrepresentations or failed to adequately inform plan participants and beneficiaries;' (3) the misrepresentation or inadequate disclosure was material; and (4) the

plaintiff detrimentally relied on the misrepresentation or inadequate disclosure." Unisys, 579 F.3d at 228.

**A.      Fiduciary Capacity**

9.      ERISA provides that a person is a fiduciary with respect to a plan to the extent that, *inter alia*, the person "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(iii).

10.      "A plan administrator . . . acts as a fiduciary when explaining plan benefits and business decisions about plan benefits to its employees." Unisys, 579 F.3d at 228 (citation omitted).

11.      WellStar is the Plan Administrator with responsibility for the administration of the Plan. As plan administrator, WellStar is a fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21). Unisys, 579 F.3d at 228; Brady v. Airgas, Inc., Civ. A. No. 15-4099, 2015 WL 6599750, at *3 (E.D. Pa. Oct. 30, 2015); Weaver Bros. Ins. Associates v. Braunstein, Civ. A. No. 11-5407, 2014 WL 2599929, at 9-10 (E.D. Pa. June 10, 2014).

12.      By executing the Application for Group Insurance and the Appointment of Fiduciary form, WellStar expressly undertook the fiduciary duty to administer the Plan and to provide notice to employees of their right to convert the group life insurance.

13.      WellStar, through Vinciane Drake in particular, acted in a fiduciary capacity in the administration of the relevant life insurance policies for the Erwoods and, in particular, in the explanation of those benefits.

**B.      Misrepresentation/Failure to Adequately Inform**

14.      The United States Court of Appeals for the Third Circuit has explained the second element of this type of claim as follows:

16

> Determining whether a misrepresentation or inadequate disclosure bears a substantial likelihood of misleading a reasonable employee may involve examining whether the "fiduciary, as an objective matter, knew or should have known that a beneficiary would be confused" by the statement or omission. Burstein [v. Ret. Account Plan for Emples. of Allegheny Health Educ. & Research Found.], 334 F.3d at 386 n.31 [(3d Cir. 2003)]; see also Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc., 93 F.3d 1171, 1182 (3d Cir. 1996) (describing omitted information as material if it is "known to the fiduciary but unknown to the beneficiary" and necessary for the beneficiary to "know for its own protection"). Thus, while showing that the fiduciary "had actual knowledge that a particular employee was about to be misled" is not required to satisfy this element, establishing a fiduciary's liability as a result of inadequately disclosed information may involve an inquiry into "the employer's knowledge of an employee's knowledge and understanding," Daniels [v. Thomas & Betts Corp], 263 F.3d [66] at 76 [3d Cir. 2001], in order to determine if the employer was aware of the confusion generated by its silence.

Unisys, 579 F.3d at 229.

15. It is undisputed that at no point did anyone at WellStar inform the Erwoods as to the need for conversion to keep their life insurance benefits "the same" at the post-FMLA stage, nor did anyone at WellStar ever issue a conversion notice to the Erwoods.

16. It is also undisputed that no one at WellStar ever provided the Erwoods with the conversion forms with which to do so.

17. WellStar's fiduciary responsibilities to administer the Plan are set forth in the Manual supplied by LINA.

18. The Manual instructed that one of WellStar's fiduciary duties was to provide Dr. Erwood with his notice of the right to convert his benefits within 15 days following the termination of his employment.

19. More specifically, as set forth in the Manual, WellStar was responsible for giving its employees, including Dr. Erwood, a Conversion Brochure, which includes a form entitled "Notice of Right to Convert Group Life Insurance."

17

20. The form requires the employer's signature, and in bold font, instructs the employer: "Make a copy of this form for your file. This is for your own protection to ensure proper notification has been given."

21. The first page of the Conversion Brochure also informs the employer that if the employer does not sign the Notice of the Right to Convert, LINA will return the application to the employee.

22. WellStar had a duty to send to Dr. Erwood the Conversion Brochure with the employer section of the form completed, no more than 15 days beyond the date his employment terminated.

23. It is undisputed that WellStar did not send to Dr. Erwood the Conversion Brochure at any time. WellStar's failure to provide notice of conversion as required by the Manual violates its duty to act "solely in the interest of the participants and beneficiaries and— (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries ... " under ERISA § 404, 29 U.S.C. § 1104(a)(1).

24. WellStar's failure to provide notice of conversion as required by the Manual violates its duty to operate the Plan in the interest of Dr. Erwood and other Plan participants and beneficiaries, as required by the SPDs.

25. Vinciane Drake, the senior representative in charge of life insurance for WellStar, testified that she did not provide information about conversion to the Erwoods because: (1) she did not receive a specific request for the information from the Erwoods; and (2) after the TIB claim was in process, she believed LINA would do so. TT1 at 138, 141. She was mistaken about the latter reason. The Court finds the former reason to be untenable, particularly in light of the numerous conversations that Plaintiff had with Drake.

18

26. In early 2012, Vinciane Drake participated in the meeting specially held by WellStar representatives for the Erwoods which was designed to provide them with all of the information required to insure that their benefits needs were met as Dr. Erwood's terminal brain cancer progressed. This type of meeting was held for those employees who did not understand their benefits and required additional information. Plaintiff indicated that the Erwoods wanted to keep their benefits the same. The WellStar representatives at this meeting explained the way in which the Erwoods could accomplish that goal: (1) during the period Dr. Erwood was still on the payroll, via paycheck deductions; and (2) after Dr. Erwood's FMLA leave ended, via COBRA coverage for medical, dental and vision insurance.[4]

27. Vinciane Drake testified that life insurance and terminal illness benefits were also discussed at the early 2012 meeting. TT1 at 127. However, WellStar never raised the issue of conversion of life insurance with the Erwoods during the meeting. Id.

28. Thus, at the meeting, WellStar provided the Erwoods with the necessary tools to keep all of their benefits during the FMLA period and to keep all of their benefits except life insurance in the post-FMLA period. In the face of the emotionally shaken Erwoods and their expressed desire to keep intact all of the benefits that Dr. Erwood had procured for his wife and seven children, WellStar was silent on the single non-addressed benefits issue at a meeting called for the express purpose of informing the Erwoods about maintaining all of their benefits.

29. WellStar failed to adequately inform the Erwoods regarding the steps necessary to keep their life insurance benefits, including conversion.

---

[4] WellStar's defense relies heavily on assertions that Dr. Erwood was given adequate notice of the necessity to convert his life insurance via several written documents, including the February 21, 2012, FMLA leave packet mailed to Dr. Erwood. It is worth noting that the information which was discussed at the meeting with the Erwoods was set forth in principal in the leave packet. Nonetheless, WellStar explained it to them at the meeting.

19

30. At trial, WellStar presented evidence that it provided Dr. Erwood notice of his right to convert when it provided him an FMLA packet on February 21, 2012, which stated: "A continuation/conversion policy may be available for employees requesting to continue life insurance coverage beyond 36 weeks. Please contact the Benefits office for specific details." Trial Exhibit 1; TT1 at 122.

31. A notice of the right to convert is inadequate where it fails to clearly state the time within which a severely ill and mentally compromised employee must apply for conversion. Brady, supra; Weaver Bros. Ins. Associates, 2014 WL 2599929, at *19.

32. The FMLA packet did not provide adequate notice to Dr. Erwood, who was severely ill and mentally compromised, of his right to convert because it did not include the materials necessary to convert the life insurance coverage beyond 36 weeks, information about where to access such materials; information about where to send such materials in order to complete the conversion process or the date that such materials were to in order to ensure continuation coverage.

33. WellStar took the position that its provision of the SPD provides sufficient notice of life insurance conversion rights.

34. Merely making an SPD available on its portal does not satisfy the disclosure obligations of WellStar, the Plan Administrator, especially in light of the fact that once Dr. Erwood's FMLA leave expired, his access to the portal was terminated.

35. The Court finds that the Erwoods did exactly what the FMLA leave packet directed them to do, they contacted the benefits office. Specifically, they repeatedly contacted Vinciane Drake, the WellStar representative responsible for life insurance benefits.

20

36.     The Court finds that WellStar, through Vinciane Drake, failed to adequately inform the Erwoods of the necessity to convert Dr. Erwood's life insurance.

37.     The Court also finds that WellStar also failed to adequately inform the Erwoods of the actions that they needed to take to convert the life insurance policies.

38.     The Court finds that WellStar failed to provide to the Erwoods the conversion forms they needed to complete and submit to continue Dr. Erwood's life insurance.

### C.     Materiality

39.     As the United States Court of Appeals for the Third Circuit has explained, "[a] misleading statement or omission by a fiduciary is material if there is a substantial likelihood that it would mislead a reasonable employee in making . . . a harmful decision regarding benefits." Unisys, 579 F.3d at 228 (internal citations and quotation marks omitted).

40.     A materially misleading statement or omission may be shown where the Plan Administrator, which has a fiduciary duty to provide information of an employee's right to convert employer sponsored life insurance, fails to notify or inform the employee of that right. Brady, 2015 WL 6599750, at *3 (quoting Unisys, 579 F.3d at 228).

41.     In response to numerous inquiries by Plaintiff and Dr. Erwood, WellStar informed the Erwoods that "everything would remain the same" upon the termination of Dr. Erwood's employment and failed to provide the Erwoods with adequate notice of Dr. Erwood's right to convert his life insurance benefits, and failed to inform him of the steps he needed to take to convert or continue his life insurance, thereby causing his benefits to lapse without his knowledge.

42.     WellStar's misrepresentations and omissions were material, and WellStar breached its fiduciary duties to Plaintiff and Dr. Erwood. Unisys, 579 F.3d at 228.

21

43. The Court easily finds that the instant inadequate disclosure was material. Permitting $750,000 in life insurance to lapse in the final year of a terminally ill person's life is unquestionably a harmful decision. Further, the Court finds that there is a substantial likelihood that such inadequate disclosure would mislead a reasonable employee in making that decision.

**D. Detrimental Reliance**

44. Finally, the Court easily finds that detrimental reliance has been established.

45. Plaintiff testified that it was the Erwoods' desire to maintain all of their insurance benefits "as is."

46. The Erwoods did maintain all of their insurance benefits "as is" as far as was explained to them at the benefits meeting. Further, when filing for the TIB claim, the Erwoods elected to take $250,000, rather than $500,000, leaving a greater benefit at the time of death.

47. Based on the evidence, Dr. Erwood clearly intended to have $750,000.00 in life coverage remaining after payment of the Accelerated Benefit and died thinking he had that much coverage for his wife and family.

48. Detrimental reliance is clearly established by the evidence of WellStar's failure to notify Dr. Erwood of his conversion rights and to otherwise inform him that he needed to take action to ensure that the $750,000 worth of insurance remained in place after payment of the Accelerated Benefit, and he died taking no further action, believing that he had $750,000 in life insurance coverage.

49. Having detrimentally relied on the inadequate disclosures by Drake and WellStar, Dr. Erwood failed to convert the life insurance policies and the remaining $750,000 was not available to Plaintiff when he died.

22

## V.  REMEDIES

1.     To recover a remedy under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), a plaintiff must show actual harm, including the loss of a right protected by ERISA or its trust-law antecedents. Amara, 563 U.S. at 443-444.

2.     Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), an ERISA beneficiary may seek surcharge as a form of appropriate legal relief for the harm caused by WellStar's breach of fiduciary duty. Horan v. Reliance Standard Life Ins. Co., Civ. A. No. 12-7802, 2014 WL 346615, at *12. (D. N.J. Jan. 30, 2014).

3.     Here Plaintiff, the Beneficiary of Dr. Erwood's Life Insurance, suffered actual harm - the loss of a $750,000 benefit.

4.     The loss of $750,000.00 worth of life insurance proceeds establishes the requisite showing of harm. Weaver Bros. Ins. Associates v. Braunstein, 2014 WL 2599929, at 24 (E.D. Pa. June 10, 2014).

5.     A verdict is entered in favor of Plaintiff against WellStar in the amount of $750,000.00

6.     As per the Hearing Memo of this Court dated February 13, 2017 (ECF No. 144), Plaintiff may file a motion for interest for the delay in recovering of the loss, and for attorneys' fees and costs to which she may be entitled under 29 U.S.C. § 1132(g) within 14 days of the date of verdict by April 27, 2017.

## VI.  CONCLUSION

Based on its assessment of the evidence and testimony, the Court concludes that Plaintiff proved, by a preponderance of the evidence, that Defendants WellStar Health System, Inc. and Group Life Insurance Program violated 29 U.S.C. § 1132(a)(3). Accordingly, a verdict in favor

23

of Plaintiff Patricia Erwood is hereby entered. Plaintiff is awarded monetary damages in the amount of $750,000.00, plus interest, attorney's fees and costs as provided by statute. Following briefing by the parties as to interest, attorney's fees, costs and set-off, an appropriate judgment will be entered.

BY THE COURT:

MAUREEN P. KELLY
CHIEF UNITED STATES MAGISTRATE JUDGE

Dated: April 13, 2017

cc:   All counsel of record via CM-ECF

24